[No. 13621-3-III.   Division Three.   September 7, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES PAUL RAKOSKY, *Appellant*.

230

*Dennis R. Scott*, for appellant.

*Thomas A. Metzger, Prosecuting Attorney*, for respondent.

SCHULTHEIS, J. — On February 28, 1993, the Pend Oreille County Drug Task Force executed a search warrant at property occupied by James P. Rakosky and seized a marijuana grow operation. Mr. Rakosky moved to have the seized evidence suppressed. The court denied the motion and on stipulated facts found Mr. Rakosky guilty of manufacturing a controlled substance and possession of a controlled substance with intent to deliver.[1] Mr. Rakosky contends the search warrant was invalid because the supporting affidavit contained information illegally acquired and, even with that information included, the affidavit did not support a finding of probable cause. We reverse.

## The Affidavit

In his affidavit Sheriff's Deputy Michael Ostlie described the circumstances underlying his belief that marijuana was being grown at Mr. Rakosky's residence:

1. In October 1992 two state game officers approached the residence while conducting an investigation. They reported entering the property through a metal gate just off the highway, and walking uphill on the driveway about 150 yards to a second gate in a fence with electric wires on the top and bottom. As they started to remove the top

---

[1]The court sentenced Mr. Rakosky to nine months on the first offense and stayed execution of the judgment and sentence pending this appeal. The second offense is covered by the judgment, but inexplicably there is no sentence for it.

wire to enter the fenced enclosure, two large guard dogs forced them to retreat. No one emerged from the residence. The officers noticed a large, windowless shed-type building within the enclosure. There were no vehicle tracks into the building, but there was a footpath in the snow between it and the residence. There was a utility meter box midway between the residence and the building. One of the game officers reported his observations to Deputy Rick Jamison, a member of the Pend Oreille County Drug Task Force team, and pointed out the property from a vantage point across the Pend Oreille River since the buildings could not be seen from the highway.

2. Deputy Jamison obtained the property's legal description and the owner's name from the assessor's office, and the owner's address and date of birth from police computers. The criminal history of the listed owner, Jeffrey J. Schwan of Reardan, Washington, showed a guilty plea/ deferred prosecution for a 1987 marijuana violation in Seattle, plus use of the alias Arthur Moore. Mr. Schwan's driving record showed a failure to appear for a speeding violation in Spokane.

3. In November 1992 Deputy Ostlie obtained electricity consumption records for the property from the public utility district (PUD), which showed there were two separate meters on the property. One served the residence, the other served the outbuilding, which had been built after Mr. Schwan bought the property. In October 1992 Mr. Schwan had placed both accounts in the name of Jim Adams. The records showed monthly consumption rates for the residence were three to four times what they had been before Mr. Schwan acquired the property, and the outbuilding was consuming about the same amount of electricity that the residence had before Mr. Schwan's ownership. Deputy Ostlie learned from the previous owner that the twenty-four foot by thirty-two foot residence had wood stove type fireplaces in the basement and main floor, with small portable electric heaters as a secondary heat source. Deputy Ostlie stated his own electricity consump-

tion was approximately the same for an all-electric house more than twice the size, in the same approximate area, kept at a constant temperature of 72 degrees with no secondary heat source. The report obtained by Deputy Ostlie covered December 18, 1991 to September 14, 1992. A second report obtained by another deputy in February 1993 covered October 14, 1992 to February 16, 1993.

4. The drug task force directed the sheriff's patrol division to monitor activity at the residence for the next few months. In December Deputy Don Garner "conducted a stop and talk" with the driver of a van stuck in the snow near the driveway gate. The driver identified himself as James Adams, from California, and gave a birth date. Police checks indicated there was no conforming California driver's license. Deputy Garner made further inquiries and determined the van driver had identified himself to others, including the mail carrier, as James Adams.

5. Deputy Garner "conducted a traffic stop on the van" and discovered the driver was "James Adams." When asked for his license, the driver identified himself as Paul James Rakosky and produced a California license. He explained he had used the false name due to some trouble he had had in California. The license and police checks showed his actual name as James Paul Rakosky, and a criminal records check showed a marijuana possession charge in May 1991 in Orange County, California. The owner of the van was Michael Keith Privette of Kirkland, Washington. A criminal records check showed a 1989 marijuana possession charge in Kirkland.

6. During several months of observation, officers noticed snow did not accumulate on the metal roof of the outbuilding despite heavy snowfall and an average accumulation of twenty to thirty inches on other composite and metal roofs in the area. Occupancy of the residence was sporadic, with several days' occupancy followed by up to a week's vacancy. The driveway was kept plowed, and the two guard dogs, both Rottweilers, ran free within the inner fence enclosure.

Deputy Ostlie concluded his affidavit with the following summary:

> Based upon the criminal histories of the three individuals involved with the property, their past and present attempts to provide aliases or variations of names on utility accounts, vehicle registrations and police reports, unusual electrical consumption rates, the placement of gates and fences upon the property absent any livestock, trained guard dogs with free access to all structures within the inner perimeter electric fence situated on the property, the absence of continuous occupancy at the residence with abnormally high electrical consumption, the lack of snow accumulation on the roof of the large shed during the winter months, absence of vehicle tracks or equipment entering the large shed, and a van that has no windows (panel) and covered rear windows and [is] used exclusively by individuals at the property, leaves one to believe that there is probable cause to believe that the crime of cultivating marijuana is occurring upon the property of and within the structures of the Schwan residence.

## THE SUPPRESSION HEARING

At the suppression hearing Mr. Rakosky challenged the legality of Deputy Garner's "stops." Arguing the stops were pretextual, he sought to have the information gathered during and as a result of those stops excised from the affidavit and excluded from consideration in the determination of probable cause. Mr. Rakosky also sought exclusion of the power records obtained in November and February, arguing they were acquired in violation of RCW 42.17.314,[2] and excision from the affidavit of all information derived from the records.

Over the objections of both Mr. Rakosky and the State,[3] the court insisted on an evidentiary hearing because it

---

[2]Information obtained in violation of the statute is inadmissible in any criminal proceeding, including applications for search warrants. RCW 42.17.314; *State v. Maxwell*, 114 Wn.2d 761, 769, 791 P.2d 223 (1990).

[3]Both objected on the basis the court should rely solely upon the affidavit to determine whether it supports a finding of probable cause. Mr. Rakosky argued the ambiguities favored automatic excision, while the State argued an evidentiary hearing would only be appropriate to determine whether the affidavit contained false statements.

could not determine the legality of the traffic stops and utility records from the affidavit. When the hearing reconvened, Deputy Garner testified Mr. Rakosky flagged him down the first time because he was stuck in the snow and wanted help. Deputy Garner asked his name and the defendant told him James Adams. On cross examination the deputy conceded he might have also asked for his date of birth, he did not remember. He further testified the second contact occurred while he was on routine patrol in Cusick. He observed a van being operated erratically and pulled it over to determine whether the driver was drunk. He testified he did not recognize the van, but as he approached the driver, he recognized "Mr. Adams." After the deputy asked for his driver's license and registration, he learned Mr. Adams was really Mr. Rakosky.

During the hearing Deputy Ostlie was also examined about the two requests for electricity records, copies of which were placed in evidence. While the first request contains the information required by RCW 42.17.314, Deputy Ostlie conceded the second did not. He explained the PUD usually caught mistakes like that and had the submitting officer fill out another form, but he did not know if that had occurred in this case.

Orally, the court found the first power consumption request was proper, and the second was a continuation of the first; it therefore declined to exclude either record from the probable cause determination. The court further found neither stop was an unlawful pretextual stop, but expressed concern about the deputy's request for Mr. Rakosky's birth date during the first encounter. The court then considered the information in the affidavit and found it sufficient, even without consideration of Mr. Rakosky's prior drug conviction, which the police uncovered through use of his correct birth date.[4]

---

[4]In its brief the State contends the court erred by suppressing the phony birth date first given when Mr. Rakosky identified himself as "Jim Adams." In fact, the court also suppressed Mr. Rakosky's true birth date and the criminal

## STANDARD OF REVIEW

■■ CrR 3.6 requires the court to enter written findings of undisputed and disputed facts, and conclusions of law, following a suppression hearing. This court then reviews challenged findings to determine whether they are supported by substantial evidence, meaning a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the findings. *State v. Hill*, 123 Wn.2d 641, 644, 647, 870 P.2d 313 (1994). Here, the court did not enter written findings and conclusions, but the error is harmless because the court's oral decision is sufficient to permit review. *State v. Riley*, 69 Wn. App. 349, 352-53, 848 P.2d 1288 (1993).

## ANALYSIS

■ Mr. Rakosky first contends the trial court should not have taken testimony at the suppression hearing. It is true that when the issuing judge did not take testimony, review is generally limited to consideration of the affidavit before the judge. *State v. Condon*, 72 Wn. App. 638, 642, 865 P.2d 521 (1993), *review denied*, 123 Wn.2d 1031 (1994). Here, however, the court did not err by holding an evidentiary hearing. Mr. Rakosky was challenging not only the facial sufficiency of the affidavit, but also the legality of certain information contained within the affidavit. The evidentiary hearing can be viewed as a preliminary suppression hearing on these issues, since the court could not determine from the face of the affidavit whether Mr. Rakosky was entitled to suppression of the challenged information.

The hearing also arguably comes within the purview of *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), which holds a defendant is entitled to an evidentiary hearing upon making a "substantial preliminary showing" that an officer of the state knowingly or recklessly made a false statement that was the basis of a

---

history obtained through its use. The State, however, did not cross-appeal; we will not consider its assignment of error.

court's probable cause finding. Although Mr. Rakosky did not make the requisite preliminary showing, his challenges came within the broader rationale of the rule. This type of evidentiary hearing was instituted to detect and deter the issuance of warrants based on information gathered as a result of government misconduct. *State v. Moore*, 54 Wn. App. 211, 214-15, 773 P.2d 96, *review denied*, 113 Wn.2d 1027 (1989).

██ Mr. Rakosky next contends the court should have suppressed the power consumption records obtained as a result of the improper second request of the sheriff's department and all information obtained as a result of Deputy Garner's stops. The burden was on Mr. Rakosky to support his claims of pretext and statutory violation. *State v. Smith*, 50 Wn.2d 408, 412, 312 P.2d 652, 314 P.2d 1024 (1957); *Moore*, 54 Wn. App. at 218-19. Substantial evidence supports the court's finding that neither stop was a pretextual stop. A pretextual stop occurs when the police use a legal justification to make a traffic stop in order to search the person or vehicle, or to interrogate the person, with the hope of recovering evidence of a more serious crime for which they do not have the reasonable suspicion necessary to support a stop. *State v. Chapin*, 75 Wn. App. 460, 464-65, 879 P.2d 300 (1994), *review denied*, 125 Wn.2d 1024 (1995). Mr. Rakosky provided no evidence that either stop was pretextual or otherwise unlawful, and Deputy Garner's testimony provided proof they were not.

█ Substantial evidence also supports the court's finding that the second utility record request did not violate RCW 42.17.314 because it was a continuation of the proper first request. RCW 42.17.314 requires a law enforcement authority requesting a person's utility records to provide the PUD with a written statement indicating the authority suspects the person of a crime and reasonably believes the records could help determine the truth of the suspicion. The Pend Oreille County Sheriff's Department provided the PUD with the requisite written statement in November 1992, on Deputy Ostlie's request form covering the

calendar years 1991 and 1992. Although Mr. Rakosky established there was no such written statement in Deputy Bruce Langridge's February 1993 request form covering the months of October 1992 through February 1993, the PUD already had the requisite written statement in its files. The technical requirements of the statute were satisfied, although the better procedure would be to include the statement in every request.

Finally, Mr. Rakosky contends the affidavit does not support a finding of probable cause. We agree.

█ Probable cause is established when the affidavit sets forth facts sufficient to lead a reasonable person to conclude there is a probability the defendant is involved in criminal activity. *State v. Young*, 123 Wn.2d 173, 195, 867 P.2d 593 (1994). The application for a search warrant must be judged in the light of common sense, with doubts resolved in favor of the warrant. *Young*. Generally, the probable cause determination of the issuing judge is given great deference, but evidence seized pursuant to a warrant issued without probable cause must be suppressed. *Young*, 123 Wn.2d at 195-96; *State v. Sterling*, 43 Wn. App. 846, 849, 719 P.2d 1357, *review denied*, 106 Wn.2d 1017 (1986).

Ordinarily, a case such as this one begins with a tip to the police by an informant that marijuana is being grown by a certain individual or in a certain location. When the police can show the informant is credible and obtained the information in a reliable way,[5] they can use the tip to establish probable cause in an affidavit supporting a search warrant. *State v. Huft*, 106 Wn.2d 206, 209-10, 720 P.2d 838 (1986); *State v. Jackson*, 102 Wn.2d 432, 436-37, 688

---

[5]The affidavit must set forth (1) some of the underlying circumstances from which the informant drew his conclusion so that a magistrate can independently evaluate the reliability of the manner in which the informant acquired his information and (2) some of the underlying circumstances from which the officer concluded the informant was credible or his information reliable. *Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); *State v. Jackson*, 102 Wn.2d 432, 435, 688 P.2d 136 (1984).

P.2d 136 (1984). *See Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964). If the tip fails either or both prongs of the test, probable cause may still be established by independent police investigation. *Huft*, 106 Wn.2d at 210; *Jackson*, 102 Wn.2d at 438. These investigations should point to suspicious activities or indications of criminal activity along the lines suggested by the informant; corroboration of innocuous facts is insufficient. *Huft*; *Jackson*.

In this case, however, the affidavit sets forth the details of a police investigation commenced after receipt of a tip that does not allege any illegal activity. The information provided by State Game Officer Ted Holden, although verified by the police, consisted of innocuous facts that do not point to criminal activity or even suspicious activity. The police discovered the following additional facts: (1) the nonresident owner of the property had pleaded guilty to a 1987 marijuana violation in Seattle, (2) Mr. Rakosky was living at the property under the false name of James Adams because he had been in trouble in California (charged in 1991 with possession of marijuana),[6] (3) the owner had transferred utility accounts to "James Adams," (4) the house was consuming three to four times more electricity than when the previous owner lived there and the new outbuilding was consuming as much electricity as the house during the previous owner's occupancy, (5) the metal roof of the outbuilding did not accumulate snow while other roofs in the area accumulated twenty to thirty inches, and (6) Mr. Rakosky was using a van belonging to a Kirkland man who had been charged in 1989 with marijuana possession. Absent any information that marijuana was being grown on the property, these facts do not permit a reasonable inference of current criminal activity. *See Huft*, 106 Wn.2d at 211; *Jackson*, 102 Wn.2d at 438; *State v. Mickle*, 53 Wn. App. 39, 44, 765 P.2d 331

---

[6]As previously noted, the trial court suppressed this information and did not consider it in its probable cause determination.

(1988); *State v. McPherson*, 40 Wn. App. 298, 301, 698 P.2d 563 (1985). It is not illegal to secure one's premises, even if it impedes official investigations. Nor is it illegal to heat a building, even if neighbors and police cannot tell whether it contains a hot tub, tomatoes, orchids, marijuana, exotic animals or nothing at all. The police did not have sufficient incriminating information to obtain a warrant.

The trial court's probable cause determination must be reversed and the evidence seized under the warrant excluded. *Young*, 123 Wn.2d at 196. Mr. Rakosky's convictions are reversed.

THOMPSON, J., concurs.

SWEENEY, J. (dissenting) — The standard of review from a trial court's determination of probable cause is deferential. *State v. Murray*, 110 Wn.2d 706, 713, 757 P.2d 487 (1988) (holding any doubts should be resolved in favor of upholding the warrant); *State v. Cord*, 103 Wn.2d 361, 366, 693 P.2d 81 (1985) (indicating the trial court's probable cause determination entitled to great deference); *State v. Jackson*, 102 Wn.2d 432, 446, 688 P.2d 136 (1984). Probable cause is not viewed in a hyper-technical manner. *State v. Vonhof*, 51 Wn. App. 33, 41, 751 P.2d 1221, *review denied*, 111 Wn.2d 1010 (1988), *cert. denied*, 488 U.S. 1008 (1989). Since the State did not appeal the court's suppression of James P. Rakosky's criminal history, this court must review the sufficiency of the affidavit with that information deleted. *State v. Garrison*, 118 Wn.2d 870, 873, 827 P.2d 1388 (1992).

I agree with the majority's conclusion that none of the circumstances in Deputy Michael Ostlie's affidavit, taken alone, are adequate to support a finding of probable cause. When combined and considered together, however, they provide rational grounds for believing that criminal activity was taking place at the Schwan property. *Murray*, 110 Wn.2d at 712; *State v. Patterson*, 83 Wn.2d 49, 61, 515 P.2d 496 (1973). Examining the affidavit, deferring to the

issuing judge, and resolving doubts in favor of validity, I believe the affidavit provides sufficient facts to support the trial court's finding of probable cause.

First, the other two individuals associated with the property had prior encounters with the law involving marijuana. While a prior criminal record does not give the police probable cause to conduct a warrantless search, a prior conviction can be a factor considered by a neutral judicial officer when determining whether probable cause exists to issue a warrant. *State v. Sterling*, 43 Wn. App. 846, 851, 719 P.2d 1357 (upholding the use of an affidavit's reference to a prior "police record" as a factor in determining existence of probable cause), *review denied*, 106 Wn.2d 1017 (1986).

Second, Mr. Rakosky lied to the police by using an alias. For a probable cause determination, the court may consider furtive behavior and falsehoods made to police officers. *State v. Huff*, 64 Wn. App. 641, 647, 826 P.2d 698, *review denied*, 119 Wn.2d 1007 (1992); *State v. Goodman*, 42 Wn. App. 331, 337-38, 711 P.2d 1057 (1985), *review denied*, 105 Wn.2d 1012 (1986); *State v. Sinclair*, 11 Wn. App. 523, 531, 523 P.2d 1209 (1974). For instance, during a traffic stop Mr. Rakosky provided his real name only when asked for his driver's license. Mr. Rakosky had used an alias previously when the officer stopped and talked to him after Mr. Rakosky's van became stuck in the snow. An investigation by the officer, also summarized in the affidavit, found that Mr. Rakosky used a similar alias for his mail and electrical power accounts.

Third, the property had a three-fold increase in electrical consumption. While increased electrical usage by itself never establishes probable cause, when coupled with other factors, evidence of electrical consumption may suffice. *Sterling*, 43 Wn. App. at 851. The electrical consumption on the Schwan property is no longer innocuous when combined with the prior criminal histories, the furtive behavior on the part of Mr. Rakosky, and the officers' observations that there was intermittent human oc-

cupancy with durations "of several days and up to a week between times of occupation and vacancy" despite the large electrical consumption.

Besides these three circumstances, a number of other considerations give rise to probable cause when combined. The shed's roof did not allow fresh snow fall to accumulate while other residences would accumulate between twenty and thirty inches on both composite and metal roofs within the same area of Schwan's property. The property contained both an outer gate to block entrance from the highway and an inner perimeter electric fence. The inner electric fence allowed two trained guard dogs to have free access to all structures within the inner perimeter. Finally, a separately metered building was being heated for no obvious reason.

Each circumstance taken alone may be innocuous, but taken together and read in a reasonable, commonsense fashion they lead to a rational conclusion that the property was being used to grow marijuana indoors. It was reasonable for the issuing judge to conclude there was probably a marijuana grow operation at the site.

I would affirm the trial court's finding of probable cause.